Eastern District of Kentucky
F I L E D

JUL 1 7 2019

AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON**

CHRIS FUGMANN,

Plaintiff,

V.

DANIEL DETMER, et al.,

Defendants.

CIVIL ACTION NO. 5:18-cv-358-KKC

**ORDER & OPINION**

\*\*\* \*\*\* \*\*\*

Before the Court are cross-motions for summary judgment. [DE 43; DE 44.] Plaintiff Chris Fugmann has moved for partial summary judgment on his breach of contract, equitable estoppel, fraud in the inducement, and promissory estoppel claims. [DE 43.] Defendants Daniel Detmer and C2 IT, LLC d/b/a Nelson Comfort, on the other hand, have jointly moved for summary judgment on all claims presented against them. [DE 44.] For reasons stated below, the Court: (1) **DENIES** Plaintiff's motion for partial summary judgment [DE 43]; and (2) **GRANTS in part and DENIES in part** Defendants' joint motion for summary judgment. [DE 44.]

## BACKGROUND

Climate Control, Inc. is a Lexington-based HVAC company that services both residential and commercial properties. Plaintiff Chris Fugmann purchased Climate Control from his father in 1992 and ran the company for two decades before selling it to Defendant C2 IT, LLC d/b/a Nelson Comfort in 2013. [DE 44-4.] Nelson Comfort is a regional HVAC company owned and operated by Defendant Daniel Detmer. It is this 2013 transaction that brings the parties before the Court today.

Fugmann first considered selling Climate Control back in 2010. [DE 44-6, at 18.] To that end, he hired Carrol and Company, a local business broker. [DE 44-6, at 18.] Carrol and Company

connected Fugmann and Detmer (the owner of Nelson Comfort) and the two began discussing a potential sale. These initial conversations were very informal. [DE 44-2, at 14] (Detmer noting that the original conversations were "wide and varied"); [DE 44-6, at 22] (Fugmann describing the discussions as "very general"). At some point Detmer had an appraisal performed on Climate Control, which yielded multiple values ranging from $870,000 to $1,100,000. [DE 44-2, at 19.] From this point forward, the discussions took a more serious tone.

On December 28, 2011, Fugmann sent Detmer a letter offering to sell Climate Control outright at a price of $1,750,000, plus half of the brokering commission. [DE 43-4, at 2.] Fugmann asserted that the above-appraisal price was justified, noting Climate Control's future revenue stream and the fact that he had received more lucrative offers in the past. [DE 43-4, at 2.] Fugmann then went on to list his preferences concerning the deal structure. He wanted half of the purchase price up paid up front, with the remaining balance financed over a period of six to eight years. Lastly, Fugmann indicated that he was willing to stay on after the transaction to ease the ownership transition and to help Detmer "sell, sell, sell." [DE 43-4, at 3.] Detmer declined the offer, but the two continued to negotiate.

By the spring of 2012, Fugmann had lowered his asking price to $1,600,000. [DE 44-6, at 23.] While Detmer was more receptive to this figure, he was concerned that an inflated purchase price might impact his ability to secure funding for the deal. On May 20, 2012, Detmer sent Fugmann an email detailing a meeting with a potential financier. [DE 43-5.] Though Detmer did not reveal the name of the financier, he indicated that it was an individual rather than a traditional lending institution. Detmer stressed to Fugmann the financier's belief that his $1,600,000 asking price was too high. [DE 43-5, at 2.]

Similarly, on January 8, 2013, Detmer notified Fugmann that Nelson Comfort's Board of Advisors had counseled against paying $1,600,000 for Climate Control. [DE 43-6, at 2.] Detmer told Fugmann that, based on the "hard numbers" and the appraisal figures, his Board believed

2

that Climate Control was worth closer to $1,200,000 to $1,300,000. [DE 43-6, at 2.] The Board, Detmer explained, was particularly troubled by Climate Control's revenue, which had dropped almost 25% over the previous year. Nevertheless, Detmer advised that he had "decided to override" the Board's input and was going to try to get as close to Fugmann's $1,600,000 figure as possible. [DE 43-6, at 2.]

Meanwhile, Detmer pursued financing for the deal. One of the financing options was a Small Business Administration ("SBA") loan. In the simplest of terms, the SBA offers a program whereby the federal government guarantees loans extended by private lenders to small companies. Because the loan is guaranteed by the government, the lenders are able to offer flexible terms and lower interest rates.

In January 2013, Detmer sent Fugmann a lengthy document highlighting complications with the SBA loan application process. [DE 43-7, at 5.] Detmer explained that in accordance with its underwriting procedure, the SBA would perform its own valuation of Climate Control and review the final draft of the APA. Detmer's "biggest concern" was that the government would decline the loan based on the large "air gap" between the predicted valuation and the $1,600,000 purchase price. Put differently, Detmer thought the SBA would reject the amount of goodwill being attributed to Climate Control.

Based on these concerns, Fugmann alleges that the parties tentatively agreed to structure the deal with a $1,400,000 purchase price and a separate $200,000 obligation. [DE 44-6, at 27.] Though Detmer disputes this characterization, the record tends to support Fugmann's narrative.

On February 10, 2013, Fugmann sent Detmer an email rehashing a conversation that had taken place with one of his attorneys. [DE 43-10.] Importantly, Fugmann relayed his counsel's belief that payment for the "final 200k" would best be accomplished through an employment agreement. [DE 43-10, at 3.] Detmer responded, stating that an employment agreement "made sense" and promised to draft the document. [DE 43-10, at 3.]

On or about February 11, 2013, Detmer sent Fugmann a document ("the Employment Agreement") which provided that following the sale of Climate Control, Fugmann was to work for Nelson Comfort as a "business consultant." In return, Fugmann would receive $200,000 paid out in monthly installments over a two-year period (from April 1, 2013 to April 1, 2015). [DE 43-11, at 2-3.] The Employment Agreement further noted that the purpose of the agreement was "for Chris Fugmann to easily assist in the transition of ownership from Chris to Dan and allow for an easy transfer of information." [DE 43-11, at 2.] That said, the Employment Agreement made clear that there were no set requirements for Fugmann to complete. Nor were there any attendance expectations. Rather, Fugmann could provide his consulting services from "any venue." [DE 43-11, at 2.] The record, however, reveals that the Employment Agreement sent to Fugmann was never executed by the parties.

On February 12, 2013, Fugmann's attorneys sent him a memorandum providing detailed feedback on the most recent APA draft and the deal in general. [DE 43-13, at 2.] Fugmann then passed along the memorandum to Detmer. On February 14, 2013, Detmer sent Fugmann an email addressing each point raised by Fugmann's attorneys in the memorandum. [DE 43-14.] Some of the attorneys' comments—along with Detmer's responses—are worth mentioning.

It was Fugmann's attorneys' understanding that a chunk of the purchase price might "be paid to [Fugmann] in a separate obligation for the principal amount of $200,000." [DE 43-13, at 2.] Detmer's corresponding response was "Yes," indicating that he agreed to the attorneys' characterization. [DE 43-14, at 2.] In another comment, the attorneys mention an "Obligation No. 3" that "may be tied to a separate Employment Agreement." [DE 43-13, at 3.] A consideration schedule attached to the memorandum makes clear that "Obligation No. 3" referred to a payment of $200,000 independent of the $1,400,000 purchase price, lease agreement, and commission payments that Fugmann would be receiving. [DE 43-13, at 12.] Detmer did not object to the comment, instead remarking that he did not have any issues with keeping a 0% interest rate on

4

the $200,000 obligation. [DE 43-14, at 2.] Lastly, Fugmann's attorneys observed that, based on the language of the APA, Nelson Comfort would receive a partial month of free rent at the beginning of its lease term. Fugmann's attorneys counseled that the arrangement was "unusual" and "unfair." [DE 43-13, at 8.] In response to this comment, Detmer proclaimed: "[I]s he kidding. . . . We are working on a $1,600,000 purchase agreement with a $360,000 lease agreement and compensation package that will net out to well over $2,000,000 . . . ." [DE 43-14, at 3.]

On February 22, 2013, Fugmann forwarded Detmer another email that he had received from his attorneys. [DE 43-15, at 2.] The attorneys' email cautioned that while Fugmann and Detmer had apparently reached an understanding concerning an additional $200,000 obligation, there was not a written document to that effect. Detmer replied to the forwarded email that very same day. In response to Fugmann's attorneys' statement that they had not seen a draft of the Employment Agreement, Detmer noted: "I have given you a copy of the employment agreement. Although it is very simplistic, I do believe it is binding. Please confirm." [DE 43-15, at 2.] Later in the email he also remarked: "You do have an employment agreement." [DE 43-15, at 2.]

By March 2014, Detmer had abandoned the prospect of an SBA loan and had decided instead to seek traditional financing. [DE 44-2, at 52.] Because the parties agreed that $700,000 of the purchase price was to be owner-financed, Detmer only needed to secure a loan for the remaining balance. After negotiating with multiple lenders, Detmer eventually struck a deal with First Financial Bank for a loan of $700,000 and a $250,000 line of credit. [DE 44-2, at 70.] In his deposition, Detmer could not recall whether he alerted Fugmann to the fact he chose to finance the deal without the help of an SBA loan. Nor could he remember whether he notified Fugmann that he was able to procure the additional $250,000 line of credit.

On March 3, 2013, three days before the deal closed, Detmer sent Fugmann an email suggesting that the parties could mitigate the 5% brokering commission by reallocating the purchase price. [DE 43-16, at 2.] Rather than a "1.4 million purchase price with a 200,000

5

employment agreement," Detmer recommended a structure that included a $700,000 purchase price with a $900,000 employment agreement. [DE 43-16, at 2.] This reallocation, according to Detmer, would result in a brokerage fee of $35,000 instead of $70,000. [DE 43-16, at 2.]

Fugmann and Detmer finally executed the APA on March 6, 2013. The APA spelled out the parameters of the transaction, including Fugmann's employment as a commission-based salesman and his covenant not to compete. [DE 44-4, at 4.] The APA also included an integration clause that stated:

> This Agreement supersedes all prior agreements, arrangements or understandings between the parties with respect to the subject matter hereof and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to said subject matter. This Agreement may not be amended except by a written agreement executed by all the parties hereto.

[DE 44-4, at 16.] The APA did not, however, mention the Employment Agreement or the $200,000 that had been discussed by the parties throughout the negotiation process.

Following the execution of the APA, Fugmann worked as a commission-based salesman for Nelson Comfort for five years (through the end of his non-compete agreement). Though the parties envisioned a smooth transition, it appears that Fugmann and Detmer's working relationship was severely strained. A December 16, 2016 email underscores this tension. That day, Detmer sent a message notifying Fugmann that he owed the company over $2,000 because of a loss sustained on a customer contract. [DE 43-17, at 4.] Detmer offered to deduct the amount from Fugmann's commission check but Fugmann refused. [DE 43-17, at 3.] Instead, Fugmann told Detmer to take the amount off the $200,000 that Detmer purportedly agreed to when purchasing Climate Control.

In response, Detmer asked Fugmann to provide documentation of the alleged agreement. [DE 43-17, at 2.] Detmer further claimed that he did not remember discussing the $200,000 obligation as part of the Climate Control deal and suggested that it might have been part of Fugmann's negotiations with another potential buyer. [DE 43-17, at 2.]

6

The December 2016 email thread is the only documented instance where Fugmann brings the Employment Agreement to Detmer's attention. Yet, Fugmann insists that it was not the only time the subject was broached. For one, Fugmann claims that in May of 2013, he and Detmer discussed money owed on some of Climate Control's vehicles. According to Fugmann, he acknowledged that he was responsible for the payments under the APA and requested that Detmer simply deduct the amount from the $200,000 outlined in the Employment Agreement. Detmer supposedly refused the proposal, opting instead to deduct the money from the $700,000 note he was paying on. [DE 88, at 127.] Though Detmer confirmed that the vehicle payments were deducted from his note, he does not recall Fugmann ever asking to deduct the amount from the Employment Agreement. [DE 44-2, at 100] ("I do not recall that.").

Additionally, Fugmann proclaims that he and Detmer discussed the Employment Agreement at Climate Control's Christmas Party in 2017. Though he could not remember the exact words, Fugmann recalls Detmer acknowledging the Employment Agreement and promising to honor it. [DE 44-6, at 97.] Detmer concedes that the parties spoke during the Christmas Party. His account of the conversation, however, is much different than Fugmann's. Detmer maintains that while he said something to the effect of "I'm sure we can work something out," he did not make any commitments to Fugmann regarding the $200,000. [DE 44-2, at 108.]

Fugmann resigned from Nelson Comfort in March 2018 at the termination of his five-year non-compete period. Though no longer working for Detmer, Fugmann continued to demand the $200,000 outlined in the Employment Agreement. When Detmer refused to pay, Fugmann filed the instant action in Fayette Circuit Court. The Complaint names both Detmer and Nelson Comfort as Defendants and asserts various Kentucky common law claims. Fugmann seeks $200,000 under the Employment Agreement, along with compensatory damages for fraud, punitive damages, and attorneys' fees. Detmer and Nelson Comfort removed the action to this Court on May 14, 2018.

7

**ANALYSIS**

The parties have now submitted cross-motions for summary judgment. Plaintiff Chris Fugmann moves for partial summary judgment on his breach of contract, equitable estoppel, fraud in the inducement, and promissory estoppel claims. [DE 43.] Defendants Daniel Detmer and Nelson Comfort, in turn, have filed a joint motion for summary judgment on all claims presented against them. [DE 44.]

## I.    Applicable Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is that which is outcome-determinative. *See Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). In order to prevail, the movant must prove all elements of the cause of action or defense. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). Once that burden is met, however, the opposing party must set forth specific facts showing there is a genuine issue for trial. *Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). Inferences drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–88, 106 S.Ct. 1348, 1356 (1986); *In re Crescent Communities, Inc.*, 359 B.R. 357 (B.A.P. 6th Cir. 2007).

In cases such as this one, where the parties have filed cross-motions for summary judgment, the court must address each motion separately on its merits. *In re Crescent Communities, Inc.*, 359 B.R. at 357. Just because both parties simultaneously argue that there are no genuine issues of

8

material fact, does not mean that a trial is not necessary. *Id.* Moreover, "that one party has failed to sustain its burden under Federal Rule of Civil Procedure 56 does not automatically entitle the opposing party to summary judgment." *Id.* (citing 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure: Civil 3d § 2720 (1998)).

## I. Breach of Contract

Fugmann's first claim of relief asserts that Defendants breached the Employment Agreement. Both parties have moved for summary judgment on the claim.

To prevail on a breach of contract claim, a plaintiff must demonstrate: (1) the existence of a contract; (2) a breach of one of the contract's terms; and (3) damages flowing from the breach. *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. Ct. App. 2007). Fugmann maintains that the requisite elements have been satisfied, entitling him to judgment as a matter of law. The Defendants, however, call the Court's attention to multiple defects associated with Fugmann's claim.

The record reveals that before the APA was executed, the parties were considering a $1,400,000 purchase price with an Employment Agreement worth $200,000. But, the APA, which was the only document signed by the parties, mentioned nothing of the Employment Agreement. Moreover, the APA contained an integration clause advising that the APA superseded all prior agreements and was the exclusive statement of the terms agreed on by the parties. [DE 44-4, at 16.]

Because the Employment Agreement called for monthly installments from April 1, 2013 until April 1, 2015, it could not, by its terms, be performed within the span of a year. As such, the statute of frauds applies and Fugmann harbors the burden of producing Detmer's signature. Ky. Rev. Stat. Ann. § 371.010 (West); *Rachford v. Nat'l Collegiate Student Loan Tr. 2005-3*, No. 2017-CA-000376-MR, 2018 WL 3957100, at *3 (Ky. Ct. App. Aug. 17, 2018).

The Employment Agreement itself was not signed by Detmer (or any party for that matter). Still, Fugmann asserts that it is valid and enforceable under Kentucky law because each of Detmer's emails concerning the Employment Agreement contained his electronic signature. [DE 43-1, at 12.] Defendants, however, maintain that Detmer's electronic signatures do not satisfy the statute of frauds because the purported contract involved services and not goods. [DE 44-1, at 8.]

Though admittedly an interesting issue, the Court need not address it here. Even if Detmer's electronic signature satisfied the statute of frauds, his communications and emails concerning the Employment Agreement would still only amount to an offer. The burden was then on Fugmann to accept or confirm the arrangement. Regrettably for Fugmann, his deposition reveals that he did neither of these things.

> Q: Okay. And was there a point when you said to Dan, I want this, this document; that you wanted to accept this document and this position?
>
> **A: This document was used to do the deal.**
>
> Q: I understand what it was used for. My question is, did you ever say to Dan, oh, yeah, I want to be a business consultant? Did that discussion ever take place?
>
> **A: No.**
>
> Q: It never did. And you never signed it either?
>
> **A: Did I ever sign this?**
>
> Q: Yes.
>
> **A: No.**
>
> Q: Was there any kind of email communication where you said, Dan, I want to be a business consultant?
>
> **A: I don't think so.**
>
> Q: Any kind of letter, anything like that?
>
> **A: I don't think so.**

Q: Well, I guess my question is, how was Dan supposed to know that you had -- you wanted this?

**A: That I wanted —**

MR. JOHNSON: Objection to the form. You can answer.

THE WITNESS: That I wanted what?

BY MR. RYAN:

Q. This document, this position.

**A: I didn't want this position. The position in that document is not what created this document.**

Q: What did create the document?

**A: The need to get to the selling price.**

. . .

[DE 44-6, at 93-94.] This lack of response is problematic for Fugmann. Under Kentucky law, "mere silence does not constitute acceptance unless expressly so agreed." *Rotondo Weirich Enterprises, Inc. v. Rock City Mech.*, Inc., No. CIV.A. 0:05-CV-73-HR, 2006 WL 950188, at \*3 (E.D. Ky. Apr. 12, 2006). In addition, acts or words which may imply a probable acceptance are insufficient to create a binding contract. *Venters v. Stewart*, 261 S.W.2d 444, 446 (Ky. App. 1953). Against this backdrop, the Court refuses to infer Fugmann's acceptance from the context of the transaction. Without an acceptance, there is no contract. And without a contract, there is no basis for Fugmann's breach of contract claim. Accordingly, the Court will **grant** summary judgment in favor of the Defendants with respect to Fugmann's breach of contract claim.

## II. Equitable Estoppel

Fugmann insists that the Defendants should be equitably estopped from denying the existence of the Employment Agreement worth $200,000. The doctrine of equitable estoppel is meant to prevent one party from taking advantage of another party whom it has falsely induced to act in some detrimental way. *Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581, 594–95 (Ky. 2012).

Under Kentucky law, the essential elements of equitable estoppel are: (1) conduct that amounts to a false representation or concealment of material facts, or conduct calculated to convey the impression that the facts are different from those that the party subsequently attempts to assert; (2) the intention or expectation that such conduct will influence the other party; and (3) actual or constructive knowledge of the real facts. *Adler v. Elk Glenn, LLC*, No. CIV. 12-85-ART, 2013 WL 6632057, at *10 (E.D. Ky. Dec. 17, 2013). Thus, Fugmann must demonstrate that: (1) he lacked knowledge—or access to knowledge—concerning the truth of the facts in question; (2) he relied in good faith upon the conduct or statements of Detmer; and (3) acting in reliance, he changed his position or status to its injury, detriment, or prejudice. *Id.*

Though generally thought of as a defensive doctrine, Kentucky courts have allowed plaintiffs to assert claims of equitable estoppel. *Salmon v. Old Nat. Bank*, No. 4:08CV-116-M, 2010 WL 3069070, at *6 (W.D. Ky. Aug. 2, 2010). Further, when there is a genuine issue of material fact regarding one of the underlying elements, Kentucky courts charge the factfinder with determining the doctrine's applicability. *City of Richmond v. Spangler Apartments, LLC*, 547 S.W.3d 556, 563 (Ky. Ct. App. 2018) ("Thus, we remand both claims to the trial court for factual determination of whether equitable estoppel or "honest error" doctrine apply in this case."); *Spalding v. Marion Cty. Bd. of Educ.*, 452 S.W.3d 611, 617 (Ky. Ct. App. 2014) ("[W]e note that equitable estoppel is a factual determination, which must be made by the appropriate fact-finder in the trial court."). Based on this precedent, the Court will entertain Fugmann's affirmative equitable estoppel claim.

Fugmann's equitable estoppel claim is founded on assurances supposedly made before the execution of the APA. [DE 43-1, at 14.] Specifically, Fugmann alleges that prior to closing, the Defendants consistently represented to him that the Employment Agreement was a valid contract and that he would be paid $200,000 in addition to the $1,400,000 purchase price. Fugmann emphasizes a February 2013 email in which Detmer refers to the Employment Agreement as "binding" and further states "[y]ou do have an employment agreement." [DE 43-15, at 2-3.] Based

on these representations, Fugmann claims that he agreed to a purchase price of $1,400,000 to his detriment. Had he known that Defendants were "lying about their willingness to honor their promise to pay him the additional $200,000," Fugmann maintains that he would have never entered into the APA. [DE 43-1, at 14-15.]

Fugmann contends that he also relied on the Defendants' representations in deciding to work for Nelson Comfort throughout the entire duration of the five-year non-compete period. It is Fugmann's position that if he knew the Defendants had no intention of paying him, he would have challenged the validity of the APA's non-compete provision and quit working for them immediately. [DE 1-1, at 9.]

Defendants attack Fugmann's equitable estoppel claim on multiple fronts. First, Defendants suggest that Detmer's statements concerning the Employment Agreement cannot form the basis of an equitable estoppel claim because they were forward-looking in nature. It is true that for a misrepresentation to constitute the basis for fraud, it must relate to a past or present material fact, as opposed to a future prediction. *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 249 (6th Cir. 2012). That said, the record shows that Detmer made multiple statements that spoke to a present state of affairs. The most blatant examples appear in a February 2013 email. In that email, Detmer advised Fugmann of the following: "I have given you a copy of the employment agreement. Although it is very simplistic, I do believe it is binding. Please confirm." He further remarked: "You do have an employment agreement." [DE 43-15, at 2-3.] These statements are not representations of "a future intent to enter into a contract" as Defendants suggest. As such, the Court is unwilling to accept the Defendants' line of reasoning.

Next, Defendants argue that Detmer's statements about the Employment Agreement do not amount to misrepresentations because they were true when made. Defendants claim that at certain points in the discussions for the sale of Climate Control, "Detmer did in fact intend to enter in a deal with a $1.4 million purchase price with a $200,000 consulting agreement." [DE 44-1, 12.]

13

Detmer had prepared a document to that effect and according to the Defendants, he was prepared to honor it. Defendants insist, however, that Fugmann did not accept the Employment Agreement offered by Detmer. Instead, the parties agreed that Detmer would employ Fugmann only as a commission-based salesman. Because Detmer believed his statements when making them, Defendants urge the Court to find as a matter of law that they do not qualify as misrepresentations.

Whether Fugmann believed his statements to be true, however, is a question of fact for the jury to decide. Thus, summary judgment on Fugmann's equitable estoppel claim is inappropriate.

Were that not enough, the Court also finds that there is a genuine issue of material fact as to whether Fugmann's reliance on the Defendants' statements was reasonable. Fugmann contends that prior to the execution of the APA, he was under the impression that lenders would not finance the transaction at a purchase price of $1,600,000. Because of this, Fugmann posits that the parties reached an understanding that $1,400,000 would be provided through the purchase price and the additional $200,000 would be paid through a separate obligation. According to Fugmann, it was completely reasonable to rely on the Defendants' representations despite the fact that the APA did not mention the Employment Agreement. Indeed, if the APA did reference the Employment Agreement, it would alert the lenders as to the true purchase price of the APA, completely frustrating the desire of the parties.

Fugmann's theory is certainly plausible. However, the Court cannot completely ignore the fact that the APA executed by the parties outlined Fugmann's commission-based employment and mentioned nothing of a separate Employment Agreement for $200,000. Most importantly, the APA included an integration clause indicating that the document was to represent the final and exclusive agreement between the parties.

Fugmann attempts to downplay the impact of the APA and its integration clause, noting that while the APA was a contract between him and Nelson Comfort, the Employment Agreement was between him and a different party, Detmer. And since Detmer was not a party to the APA,

14

Fugmann argues that he cannot enforce its integration clause. This argument is unpersuasive. In Kentucky, third-party beneficiaries may enforce the terms of a contract if the parties intend the third party to benefit directly under the contract. *See Young v. Kenneth Jackson Elec., Inc.*, No. 2005-CA-001242-MR, 2006 WL 2787077, at *2 (Ky. Ct. App. Sept. 29, 2006); *Lyndon Prop. Ins. Co. v. Kentucky Automatic Sprinkler Co.*, LLC, No. 2003-CA-001919-MR, 2004 WL 1948677, at *4 (Ky. Ct. App. Sept. 3, 2004). Company owners, such as Detmer, "clearly [stand] to benefit from any commercial arrangements" involving their businesses. *Hossain v. JMU Properties*, LLC, 147 A.3d 816, 820 (D.C. Cir. 2016). Here, not only does Detmer own Climate Control, but he negotiated and executed the APA on its behalf. As such, the Court finds that the APA and its integration clause are indisputably relevant to the question of reasonable reliance.

In sum, because there are, at a minimum, genuine issues of material fact as to the misrepresentation and reliance elements of Fugmann's equitable estoppel claim, the Court **denies** both parties' motions for summary judgment on the issue.

## III.    Fraudulent Inducement and Promissory Estoppel

Fugmann's Complaint also raises fraudulent inducement and promissory estoppel claims. Because the claims are so similar, the Court discusses them together in a single section.

A fraudulent inducement claim under Kentucky law requires a plaintiff to demonstrate: (1) a material misrepresentation; (2) which is false; (3) known to be false or made recklessly; (4) made with inducement to be acted upon; (5) acted in reliance thereon; and (6) causing injury. *Derby City Capital, LLC v. Trinity HR Servs.*, 949 F. Supp. 2d 712, 726 (W.D. Ky. 2013) (citing *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999)).

Similarly, to state a claim for promissory estoppel a plaintiff must demonstrate: (1) conduct that amounts to a misrepresentation or concealment of material facts; (2) known to the estopped party; (3) unknown to the other party; (4) the estopped party must act with the intention or

expectation that its conduct will be acted upon; and (5) the other party indeed relied on this conduct to his detriment. *Shane v. Bunzl Distribution USA, Inc.*, 200 F. App'x 397, 403 (6th Cir. 2006) (citing *McCarthy v. Louisville Cartage Co.*, 796 S.W.2d 10, 12 (Ky. Ct. App. 1990)).

Fugmann's fraudulent inducement and promissory estoppel claims are based on two alleged misrepresentations. First, Fugmann maintains that the Defendants "repeatedly represented" that they would pay him a total of $1,600,000 for Climate Control despite never intending to do so. Second, Fugmann asserts that the Defendants claimed that they could not obtain financing for a purchase price of $1,600,000 even though First Financial Bank ended up lending them an amount that could satisfy that figure. Fugmann claims that he would not have entered into the APA at a purchase price of $1,400,000 but for these misrepresentations. Moreover, Fugmann asserts that he relied on the misrepresentations in continuing to work for the Defendants through the full non-compete period. Fugmann insists that had he known that the Defendants had no intention of paying $200,000, he would have challenged the APA's non-compete provision and stopped working for them.

In contrast, the Defendants argue that Fugmann has not established the prerequisites of his fraudulent inducement and promissory estoppel claims. Defendants first question whether the Defendants' statements amounted to misrepresentations. As to the statements concerning the validity of the Employment Agreement, Defendants argue that Detmer's assertions were merely predictive and therefore, cannot form the basis of Fugmann's claims. The Court has already rejected this argument and will do so again. In the alternative, Defendants argue that Detmer's statements regarding the Employment Agreement do not amount to misrepresentations because Detmer believed they were true at the time of making them. This too has already been addressed. As noted *supra*, there is a genuine issue of material fact as to the intent behind Detmer's statements and assurances.

Next, Defendants assert that Detmer's statements regarding the inability to obtain financing at a purchase price of $1,600,000 do not qualify as misrepresentations. Specifically, Defendants maintain that the total financing package included $700,000 in owner financing, a $700,000 principle loan from First Financial, and a $250,000 line of credit from First Financial. According to the Defendants, the $250,000 credit line was designated for "working capital" and could not be put towards a purchase price. Therefore, the amount that could be used towards the acquisition was $1,400,000 ($700,000 in owner financing plus the $700,000 loan). This, according to the Defendants, shows that Detmer's statements were indeed true.

The Defendants' argument misses the mark. First Financial's decision to finance the deal at a $1,400,000 purchase price does not automatically mean that it (or any other institution) refused to lend at the higher purchase price of $1,600,000. Instead, the pertinent question is whether Detmer told Fugmann that lenders would not finance the deal at a purchase price of $1,600,000 despite knowing the opposite to be true. In his deposition, Fugmann claimed that Detmer told him on multiple occasions that lenders would only finance the deal at $1,400,000 purchase price. [DE 44-6, at 26] ("Dan said that his asset purchase agreement could only be for 1.4."); [DE 44-6, at 43] ("Dan said that his asset purchase agreement based on his SBA loan [could only go] up to 1.4 million."). Several questions emanate from these allegations. Did Detmer actually make these statements? If so, what were his beliefs at the time? Did Detmer even discuss the prospect of financing the deal at a $1,600,000 purchase price with lenders? These questions, however, are not the province of the Court. A jury must instead address them.

The Defendants further challenge Fugmann's fraudulent inducement and promissory estoppel claims on the basis of reliance. Defendants urge that even if Detmer did make certain representations regarding the Employment Agreement, any dependence on those statements would have been unreasonable given the terms of the APA and more specifically, its integration clause. The Defendants have a fair point here. As discussed *supra*, the APA's integration clause

17

weakens any assertions of reasonable reliance. That said, the APA does not, by itself, dispose of Fugmann's claims. Fugmann has proffered a valid explanation for why the APA did not mention the Employment Agreement worth $200,000. Specifically, the whole purpose of structuring the deal with a $1,400,000 purchase price and $200,000 Employment Agreement was to hide the true purchase price from the lenders. If the APA mentioned the Employment Agreement, the lenders would be alerted to the inflated purchase price. As such, reasonable minds could differ as to whether the record establishes that Fugmann's reliance was reasonable and in good faith.

To conclude, genuine issues of material fact exist as to whether Defendants' statements concerning the Employment Agreement and the ability to obtain financing amounted to misrepresentations. There are also genuine issues of material fact regarding whether Fugmann reasonably relied on the Defendants' alleged misrepresentations. The parties' motions for summary judgment are therefore **denied** and Fugmann's fraudulent inducement and promissory estoppel claims may proceed to trial.

## IV.    Unjust Enrichment

Fugmann brings a claim for unjust enrichment, alleging that the Defendants owe him $200,000 because they received the business consulting services called for in the Employment Agreement. The Defendants have moved for summary judgment on the issue.

As an initial matter, an aggrieved party is foreclosed from bringing an unjust enrichment claim when there is an explicit contract that has been performed by the relevant parties. *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 778 (Ky. 2017), *reh'g denied* (Mar. 22, 2018). Here, Defendants argue that Fugmann's unjust enrichment claim should fail because the parties signed and subsequently performed the APA, which outlined Fugmann's employment as a commission-based salesman. In a typical situation, the Defendants would be correct. The APA would govern, and the Court would dismiss the unjust enrichment claim. Fugmann, however, is able to avoid this result because

he is also bringing a viable claim for fraudulent inducement. *See Adler*, 2013 WL 6632057, at \*5 (noting that an unjust enrichment claim may proceed, even when there is an explicit contract, if there is an allegation of fraud).

To prevail on an unjust enrichment claim, a plaintiff must prove three elements: (1) a benefit conferred upon the defendant at the plaintiff's expense; (2) a resulting appreciation of the benefit by the defendant; and (3) inequitable retention of the benefit without payment for its value. *See Furlong Dev. Co., LLC v. Georgetown-Scott Cty. Planning & Zoning Comm'n*, 504 S.W.3d 34, 39–40 (Ky. 2016).

Fugmann claims he provided the Defendants with the business consulting services outlined in the Employment Agreement, yet was not compensated accordingly. Fugmann contends that he answered Detmer's questions, preserved key customer relationships, and boosted the morale of Climate Control's employees. These services, according to Fugmann, were distinct from those required in his sales role and allowed for the continued prosperity of Climate Control.

Defendants, in turn, argue that Fugmann should be precluded from asserting his unjust enrichment claim because he failed to accept the Employment Agreement when it was originally offered by Detmer. The Court fails to see the relevance of this argument. Whether Fugmann accepted the arrangement speaks only to the issue of whether a valid contract existed—it does not dispose of the unjust enrichment claim. Indeed, the whole point of an unjust enrichment claim is to afford the plaintiff relief in the absence of a binding contract.

As an alternative argument, Defendants submit that they are entitled to summary judgment on Fugmann's unjust enrichment claim because Fugmann worked only as a commission-based salesman and there is no evidence that he provided any business consulting services. Fugmann counters, arguing that he did provide business consulting services, even though the Employment Agreement did not establish any set requirements for him. [DE 47, at 15.]

Fugmann's deposition does not counsel either way. On one end of the spectrum, Fugmann testified that he frequently answered Detmer's questions regarding Climate Control. [DE 44-6, at 48] ("If [Detmer] wanted to ask me questions to – how to run the company, I would help him."). On the other end, Fugmann stated that he was only a salesman, had never been a business consultant before, and had no idea what a business consultant does. [DE 44-6, at 92.] Accordingly, the Court determines that genuine issues of material fact exist as to whether Fugmann performed the business consulting services called for in the Employment Agreement. Defendants' motion for summary judgment on Fugmann's unjust enrichment claim is **denied** and the issue may proceed to trial.

## V.    Fraudulent Misrepresentation

Lastly, Fugmann brings a fraudulent misrepresentation claim. Under Kentucky law, a fraud claim based on misrepresentation requires: (1) a material representation; (2) which is false; (3) known to be false or made recklessly; (4) made with inducement to be acted upon; (5) acted in reliance thereon; and (6) causing injury. *Hunt Enterprises, Inc. v. John Deere Industrial Equipment Co.*, 18 F.Supp. 2d 697, 702 (W.D. Ky. 1997) (quoting *St. Martin v. KFC Corp.*, 935 F.Supp. 898, 909 (W.D. Ky. 1996)).

Fugmann's fraudulent misrepresentation claim focuses on conduct that allegedly occurred *after* the deal for Climate Control had closed. The Complaint asserts that after the APA was signed, the Defendants continued to represent to Fugmann that they would pay him the additional $200,000 under the Employment Agreement despite having "no intention" of doing so. [DE 1-1, at 12.] Moreover, Fugmann asserts that he relied on the misrepresentations to his detriment in staying on to work for the Defendants after the deal. Had he known that Defendants were lying, Fugmann maintains that he would have challenged the APA's non-compete provision and quit working for them.

Defendants have moved for summary judgment on the claim, arguing that Fugmann has failed to meet his burden of establishing that Detmer "made a material and false representation that he knew to be false at the time of making it." [DE 48, at 11.] Upon review, the Court determines that there are genuine issues of material fact as to whether the Defendants made any misrepresentations regarding the Employment Agreement *after* the APA was executed. Fugmann alleges that Detmer acknowledged the validity of the Employment Agreement on multiple occasions following the closing of the deal. Fugmann first asserts that in May of 2013 he asked Detmer if he could deduct money owed on certain Climate Control vehicles from payments owed to him under the Employment Agreement. Fugmann claims that Detmer acknowledged the existence of the Employment Agreement worth $200,000 but instead opted to deduct the amount from the $700,000 note he was paying on. [DE 88, at 127.] While Detmer confirmed that the vehicle payments were deducted from his note, he does not recall Fugmann ever asking to deduct the amount from the Employment Agreement. [DE 44-2, at 100] ("I do not recall that.").

Second, Fugmann claims that the parties discussed the Employment Agreement at Climate Control's Christmas Party in 2017. According to Fugmann, Detmer acknowledged the Employment Agreement's validity during the conversation and promised to honor it. [DE 44-6, at 97.] Detmer concedes that the parties spoke during the Christmas party; however, he swears that he made no commitments to Fugmann regarding the $200,000. [DE 44-2, at 108.]

Because there are conflicting accounts, it is up to the jury to decide who is telling the truth. Defendants' motion for summary judgment is **denied** accordingly and the claim shall proceed to trial.

## CONCLUSION

For these reasons, (1) Plaintiff Chris Fugmann's motion for partial summary judgment [DE 43] is **DENIED**; and (2) Defendants Nelson Comfort and Daniel Detmer's joint motion for summary judgment [DE 44] is **GRANTED in part and DENIED in part**. As a result of this Court's Order,

Plaintiff Chris Fugmann may proceed on his equitable estoppel, fraudulent inducement, promissory estoppel, unjust enrichment, and fraudulent misrepresentation claims against the Defendants

Dated July 17, 2019.



Signed By:
Karen K. Caldwell
United States District Judge